

1

2

3

4

5

6

7

8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10   THOMAS E. ALEXANDER,                  )        CV 11-8851 DSF (VBKx)
                                           )
11                  Plaintiff,             )
                                           )
12          vs.                            )   **FINDINGS OF FACT AND**
                                           )   **CONCLUSIONS OF LAW AFTER**
13   INCWAY CORPORATION, a Wyoming         )   **COURT TRIAL**
     corporation, COMPANIES                )
14   INCORPORATED, a Wyoming               )
     corporation, PRESIDENTIAL SERVICES    )
15   INCORPORATED, a Nevada corporation,   )
     KEVIN W. WESSELL, an individual,      )
16   CASEY LAWRENCE, an individual,        )
     MATT MITCHELL, an individual, and     )
17   DOES 1 through 10, inclusive,         )
                                           )
18                  Defendants.            )
                                           )
19                                         )
                                           )
20                                         )
                                           )
21                                         )
                                           )
22   _____)

23          This case having come on for trial without a jury, and the Court having heard

24   live testimony, viewed videotaped deposition testimony, and reviewed designated

25   deposition testimony, and having duly considered the evidence, the credibility of the

26   witnesses, the entire file of the Court, and the contentions and arguments of counsel,

27   the Court makes the following findings of fact and conclusions of law in accordance

28   with Rule 52(a) of the Federal Rules of Civil Procedure.

1

**FINDINGS OF FACT**

**PLAINTIFF THOMAS E. ALEXANDER**

1.  Plaintiff Thomas E. Alexander is a real estate agent in Anchorage, Alaska.  [Reporter's Transcript: June 18, 2013 (RT1), 4:10-18.]

2.  In about June 2008, Alexander was considering opening an offshore account, but had no prior experience with such accounts.  (The witnesses often seem to use the term "offshore account" to mean "offshore company."  See RT 1, 29:7-8.) Alexander was concerned because he was involved in a large development in Anchorage, the economy had started to turn bad, and the development started getting "questionable."  He was one of four partners, and the other partners were not financially stable, so he wanted to set aside some assets that would be protected. [RT1, 5:2-4, 7:18-19, 29:7-14.]

3.  Alexander went online and found Companies, Incorporated (CI).  He concluded it had a "very substantial web page that looked like they knew what they were doing," and called its toll free telephone number, 1-800-COMPANIES.  [RT1, 5:5-10.]

4.  When Alexander first made contact with CI, he had more than $524,700 available for deposit in an offshore bank account.  [Reporter's Transcript: June 19, 2013 (RT2), 88:19-25.]

5.  After explaining to the receptionist that he wanted to explore the option of opening an offshore account, Alexander eventually was put through to Defendant Kevin W. Wessell.  [RT1, 5:16-20.]

6.  Alexander asked Wessell how the process worked, and Wessell explained that the account could be set up in Nevis, a small country in the Caribbean.  When Alexander expressed concern about putting his money there, Wessell said that the offshore corporation would be registered in Nevis, but the money would go into a bank at some other place.  [RT1, 6:3-12.]

2

7.  Alexander told Wessell that his only goal was to have his money in a safe place where he could access it at any time.  He did not want it in a CD.  [RT1, 7:3-6, 7:25-8:3, 24:14-16.]

8.  Alexander had always heard about Swiss bank accounts, and asked Wessell if the account could be in a Swiss bank.  Wessell told him that Sweden has a better banking system and stronger banking laws, and Wessell highly recommended that he deposit his money in a financial institution called The Alps.  Alexander had never heard of The Alps before.  He said he would "think about it." [RT1, 6:22-7:17, 8:10-12; RT2, 88:13-16.]

9.  In September 2008, defendant Matt Mitchell[1] called and told Alexander that he would help Alexander set up the offshore LLC in Nevis, and would mail Alexander the necessary information.  Mitchell also said defendant Casey Lawrence would help Alexander set up the bank account.  [RT1, 8:12-23.]

10.  Alexander then received a large, impressive package in the mail, containing stock certificates and directions about what to fill out.  Exhibit 5 looks like what he received.  That Exhibit purports to be materials from CI, and purports to have been copyrighted by Wessell and Presidential Services Incorporated (PSI). [RT1, 9:9-10:13; Ex. 5.]

11.  The materials state that CI provides "a full service solution," (Ex. 5 at 38[2]), that CI has been "Trusted since 1977," (Ex. 5 at 40), and that CI is "committed to constantly improving [its] services," (id.).  The materials indicate that CI is a division of PSI.  (Id. at 41.)  The materials would be likely to convince the average person that CI was skilled at assisting people who wanted to "Lawsuit-proof [their] assets" and "judgment-proof [their] wealth."  (Id.)

12.  It appears Alexander actually established the offshore entity, Cold

---

[1] Matt Mitchell's true name is Paul Hesse.  He began using the name Matt Mitchell when he joined CI in March 2005, allegedly because he didn't want to spell "Hesse" 50 to 100 times a day.  [RT2, 34:12-35:4.]
[2] The Court refers to the page numbers at the bottom right of the document.

1  Play Ventures, LLC, (Ex 5 at 65, et seq.), but there is no suggestion that the funds
2  Alexander had available were ever transferred to Cold Play or that Cold Play (as
3  opposed to Alexander himself) sent any funds to The Alps.

4      13.  Alexander also received documents that he was to complete to open
5  the account with The Alps.  (Ex. 6.)  He completed them and sent them back to
6  Lawrence.  [RT1, 10:14-11:8.]

7      14.  Alexander saw The Alps' web page before he wired any money.  The
8  only thing he looked at before wiring money was the home page, which showed a
9  big building and had Alexander's login.  The home page of the website conveyed to
10  Alexander that The Alps was the Wells Fargo and the Bank of America of Sweden;
11  and that a bank that has its headquarters in the World Trade Center must be a pretty
12  substantial bank.  Although Alexander referred to Exhibit 24 as the website he saw
13  before making his initial deposit in 2008, the Exhibit has a copyright date of 2009.
14  There are several possible explanations for this apparent inconsistency – and
15  defendants did not produce a copy of a previous website home page – or provide
16  any testimony or evidence that Exhibit 24 was not the same or substantially similar
17  to the web page that Alexander would have seen in 2008.  [RT1, 39:14-23 and
18  32:14-23, 14:15-24; Ex. 24.]

19      15.  Wessell represented to Alexander that Sweden had the best banking
20  regulations anywhere, that Sweden did not have branches in the United States, that
21  Sweden was better than Switzerland, that many or most of Wessell's clients are in
22  Sweden at a bank called The Alps, and that he would recommend that Alexander
23  deposit his money with The Alps.  [RT1, 7:10-7:15, 36:6-16.]

24      16.  Alexander also recalled more generally that he did business with
25  Wessell, Mitchell, and Lawrence because they boasted about their 30 years of
26  experience helping people and taking care of them, talked about honesty, integrity
27  and vast knowledge in this area, that they had many happy clients at The Alps and
28  that it was the right thing to do.  All three made statements that the Swedish had the

4

strongest banking regulations anywhere, and assured him that Sweden was a safe place to be, that his money was safe and that he could access it at any time.  He was told that it was "highly recommended" that he put his money in Sweden.  [RT1, 23:15-23:21, 35:7-17, 36:6-11; RT2, 88:13-88:16.]

17.  Mitchell admitted that The Alps was the only Swedish bank that he knew of that they were working with, and one of the things he was doing was recommending it to customers.  [RT2, 41:2-15.]

18.  In March 2009, when Alexander considered whether to diversify, Lawrence sent him a list of five banks.  During a later telephone call, Lawrence and Alexander talked more about The Alps and she said; "Well, we have a lot of clients there.  Everybody has always done well."  [RT1, 50:1-51:12.]

19.  Neither Wessell, Mitchell, nor Lawrence advised Alexander that credit unions in Sweden are not regulated.  [RT1, 51:13-18.]

20.  Neither Wessell, Mitchell, nor Lawrence advised Alexander that Wessell or Mitchell were directors of The Alps.  Alexander has not established that Lawrence knew that Mitchell was a director, but she believed that Wessell was the chairman.  [RT1, 23:23 - 24:4-13; RT2, 72:11-16.]

21.  Neither Wessell, Mitchell, nor Lawrence advised Alexander that the money he was depositing with The Alps would be used to make real estate investments in Washington.  [RT1, 24:12-16.]'

22.  Alexander testified that he did no investigation about Swedish credit unions before he wired money because that is what he was paying CI to do.  The only due diligence he did was to talk to Wessell, Mitchell, and Lawrence.  He never thought that it was necessary to do any due diligence on any bank that he had used before, such as Bank of Hawaii.  [RT1, 40:16-:22, 46:10-14, 47:5-13, 53:3-53:12.]

23.  Alexander believed he had all the information he needed to know about The Alps by talking to Wessell and Lawrence.  [RT1, 40:12-40:15.]

1      24.   Alexander had no reason to believe that what Wessell, Mitchell, and

2  Lawrence told him was not true.  [RT1, 23:11-22, 40:12-40:15.]

3      25.   Lawrence gave Alexander instructions on how to wire money, which

4  Alexander took to his bank in Hawaii.  Alexander initially transferred $25,000 in

5  December 2008 to be sure the wire would go through.  [RT1, 11:17-12:15, 13:10-

6  23, Exs. 26, 31.]

7      26.   In January 2009, Alexander made two additional transfers from his

8  bank in Hawaii to be deposited with The Alps: one in the amount of $200,000, and

9  another in the amount of $300,000.

10      27.   After Alexander had wired money to The Alps, Alexander's brother

11  sent Alexander an email directing his attention to The Alps' website's "About Us"

12  page.  The information on that page indicates that The Alps is not a bank, it's

13  nothing like the United States' equivalent of a credit union, that there might be

14  delays in receiving a withdrawal request, and that The Alps invests in real estate.

15  Alexander had not looked at this page before sending his money to The Alps.  [RT1,

16  31:4-33:21.]

17      28.   In late July 2011, Alexander attempted to wire transfer $320,000 from

18  his account with The Alps directly to a title company in Hawaii because he and his

19  wife were purchasing a property in Hawaii.  [RT1, 16:4-8, 17:10-13.]

20      29.   Although The Alps' account showed the money had been withdrawn,

21  the funds did not arrive when expected.  Alexander followed up with emails to The

22  Alps, but never received a response.  He called The Alps, but was told by the person

23  who answered that he had called an answering service for over 200 companies.

24  [RT1, 16:10-17:21, 18:8-16; Ex. 28.]

25      30.   The following day, Alexander called CI and left messages for

26  Lawrence, but did not hear back from her.  [RT1, 19:3-19:12.]

27      31.   Alexander would never have given his money to The Alps to invest in

28

1 real estate in Washington.  He was "having a real estate development issue" himself,

2 and he would not have given his money to somebody else to invest in real estate,

3 especially considering the state of the economy and real estate prices.  [RT1, 24:17-

4 22; 33:25-34:2; see RT1, 29:7-14.]

5      32.   Had Alexander known that The Alps was Wessell's and Mitchell's

6 bank, he would never have placed his money there.  [RT2, 88:17-88:18.]

7      33.   Alexander has never recovered any portion of the $524,785, and has

8 spent close to $175,000 in attorney's fees and costs to get it back.  [RT1, 23:6-9.]

9 **PANKAJ TOPIWALA**

10      34.   Pankaj Topiwala, whose deposition testimony was introduced at trial,

11 earned a Ph.D in mathematics from the University of Michigan, and has taught at

12 Tulane University, the University of Chicago and the University of Boston.  He is

13 currently the CEO of Fast VDO, LLC, a company that received more than five

14 million dollars from a patent license agreement entered into in January 2009.

15 [Topiwala Depo., 7:6-7:21 and 39:19-40:20.]

16      35.   Topiwala contacted CI after doing a search on the internet.  [Topiwala

17 Depo., 8:12- 8:21.]

18      36.   Topiwala spoke with Mitchell dozens of times and probably a dozen

19 times with Wessell.  On at least five occasions, he spoke with both of them when

20 they were on the line at the same time.  [Topiwala Depo, 9:1-9:19.]

21      37.   Topiwala was seeking tax planning advice and wanted to

22 manage and protect his assets until the taxes on those assets were due 15 months

23 later.  [Topiwala Depo, 10:9-13.]

24      38.   Both Wessell and Mitchell advised Topiwala that The Alps credit

25 union offered a five percent return on a fixed CD for a one year deposit.  [Topiwala

26 Depo, 10:15-10:19.]

27      39.   Wessell told Topiwala that he himself had invested funds in The Alps,

28 and recommended it as a safe place to invest funds.  [Topiwala Depo, 96:3-96:11.]

Case 2:11-cv-08851-DSF-VBK   Document 182   Filed 10/11/13   Page 8 of 37   Page ID #:2653

40. Topiwala had never heard of The Alps before his conversations with Wessell and Mitchell. [Topiwala Depo, 11:3-11:5.]

41. Before he transferred any money, Topiwala specifically asked Wessell and Mitchell several times about their relationship with The Alps. Wessell and Mitchell denied that they had any relationship with The Alps, but said that Wessell was a depositor. [Topiwala Depo, 28:11-29:1, 95:6-95:20.]

42. Topiwala specifically asked Wessell and Mitchell about the management structure of The Alps. They responded that The Alps was a small privately held credit union and that information about it was not publicly available. [Topiwala Depo, 29:2-29:7.] These statements contradict the information on The Alps' "About Us" web page.

43. Wessell and Mitchell told Topiwala that the assets of The Alps were well protected because they were deposited in a much larger well-known publicly-traded Swiss bank called Bank Vontobel. [Topiwala Depo, 11:21-12:5.]

44. Based on what he had been told, Topiwala transferred $5.5 million to the Bank Vontobel, to be credited to the account held by The Alps. [Topiwala Depo, 17:3-17:9.]

45. Topiwala tried to contact The Alps, and there was occasionally an operator he got through to, but he never got a response from The Alps directly. All responses came from CI. [Topiwala Depo, 17:19-19:10.]

46. When Topiwala asked Mitchell specifically why The Alps was not responding to him, Mitchell said, "The Alps is talking to you." [Topiwala Depo, 102:21-103:4.]

47. After trying unsuccessfully to get information from Bank Vontobel about The Alps account, Topiwala told Wessell and Mitchell that he was concerned about his funds. They both assured him that his funds were perfectly safe and that there was nothing to worry about. [Topiwala Depo, 21:3-21:18.]

48. On March 2, 2010, Topiwala e-mailed Mitchell to advise that he

1   planned to withdraw his funds. Mitchell then advised him that The Alps didn't have

2   the cash to return, but had other non-liquid assets. [Topiwala Depo, 23:5-23:15.]

3   Nevertheless, Topiwala apparently received $3,000,000 in cash, and a promissory

4   note for $1,800,000. The note was secured by real property and is now in default.

5   Topiwala may receive more than the amount he deposited as a result of the liens on

6   the properties securing the note. [RT 2, 131:9 – 132:13.]

7       49.  Topiwala did not know that his money would be used for real estate

8   loans. If he had known, he would not have provided the funds. [Topiwala Depo,

9   25:8-25:20.]

10  **<u>NEIL VACCHIANO</u>**

11      50.  Neil Vacchiano has been involved in real estate investing, developing,

12  and building for 32 years. [RT1, 63:3-63:8.]

13      51.  In 2008, Vacchiano decided to stop building and developing

14  activities, and was looking for a safe place to put his money. He did some

15  investigation about asset protection or offshore accounts. [RT1, 63:9-23.]

16      52.  Vacchiano found CI on the internet and called 1-800-COMPANIES.

17  [RT1, 63:23-64:8.]

18      53.  In speaking with CI, most of Vacchiano's conversations were with

19  Richard Guiterrez and Casey Lawrence. He had some conversations with Mitchell

20  and none with Wessell. [RT1, 65:6-10.] When Vacchiano first called 1-800-

21  COMPANIES he spoke with Gutierrez. Gutierrez told Vacchiano that it would cost

22  $2,450 to set up an offshore account. Vacchiano initially asked for an LLC to be

23  established, but CI recommended and formed two LDCs. CI "kind of pushed" the

24  LDC on him. [RT1, 63:8-66:11.]

25      54.  Gutierrez suggested that Stockholm, Sweden would be a safer place to

26  put his money than Switzerland, because there was a stable, well-established credit

27  union that had been there "for a lot of years and expected to be there for a hundred

28  more years." [RT1, 65:12-18.]

55.  Gutierrez and Lawrence suggested that Vacchiano set up a deposit account with The Alps.  [RT1, 74:5-11]

56.   Vacchiano spoke often with Casey Lawrence.  She seemed knowledgeable about The Alps, and told Vacchiano that she has been setting up deposit accounts at The Alps for lots of different people.  [RT1, 66:16-23.]

57.  Lawrence faxed or e-mailed application forms for The Alps for Vacchiano to complete, and also sent wiring instructions and the passwords for accessing his account.  [RT1, 66:24-67:14.]

58.   Vacchiano sent more than $318,000 to Zurich in favor of The Alps.  [RT1, 67:23-68:7.]

59.   In 2010, Vacchiano called Lawrence and told her that he wanted $90,000 wired to his local bank.  [RT1, 68:8-68:17.]

60.   For a month, Vacchiano tried to contact Lawrence.  He would call, but she was not there, and he could never get hold of her.   [RT1, 68:19-68:23.]

61.   Eventually Vacchiano reached Lawrence and she referred him to Matt Mitchell.  Mitchell told him that everyone who has money in The Alps had to speak to Marshall Hann.  [RT1, 69:17-70-3.]

62.   Vacchiano spoke with Hann, who told him that the real estate market in Stockholm and Sweden had gone south, and had affected the monies.   [RT1, 70:9-70:12; 76:6-76:10.]

63.   Vacchiano was never told that his money would be invested in real estate.  As a person involved in real estate in Virginia, he would never have given his money to The Alps to invest in real estate.  [RT1, 70:9-70:17.]

64.   Vacchiano was never told that Wessell and Mitchell were directors of The Alps.  If he had known that, he would never have sent money to The Alps.  [RT1, 71:3-71:10.]

65.   Vacchiano has not recovered any of the $318,000 he placed on deposit with The Alps.   [RT1, 67:23-68:3, 71:9-10.]

**INCWAY AND COMPANIES INCORPORATED (CI)**

66.   From 2000 to 2009, defendant Incway Corporation was involved in establishing companies, setting up foreign corporations in places like Nevis, and setting up foreign bank accounts.  Incway was doing business in California as CI.  It is no longer in business.  [Wessell Depo., 18:17-19:3, 20:1-19; 16:15-19; 32:13-33:19.]

67.   Incway/CI, now known as Worldwide Education Services filed bankruptcy and obtained an automatic stay of any attempts to enforce a judgment against it in this case.  (Doc. 81.)

***Wessell's Role in Incway/CI***

68.   Wessell was a director and manager of Incway.  [Wessell Depo., 23:7-8, 18:21-24.]

69.   Wessell claimed not to recall the names of the other Incway directors, and questioned whether he ever knew their identity.  [Wessell Depo., 22:25-23:1 30:9-12.]

70.   At his deposition, Wessell avoided disclosing if he had any interest in Incway by contending he did not know what "interest" meant.  [Wessell Depo., 17:8-18:1.]

71.   Wessell was a director, president, secretary, and treasurer of CI. [Wessell Depo., 43:17-24.]

72.   CI established national and international corporations and bank accounts.  [Wessell Depo., 105:13-22.]

73.   Despite his corporate officer roles, Wessell feigned ignorance about Incway/CI's business operations and internal affairs.  Wessell's testimony is not credible.  [Wessell Depo., 37:20-22, 60:3-5.]

74.   Wessell uses the internet in various ways to attract potential

11

investment clients.  Wessell, for instance, operates a website for Offshore

Corporation, "World's Largest Offshore Incorporator."  [RT2, 117:13-18; Ex. 81.]

75.   Offshore Corporation's website states that it is a "division of

Companies Incorporated."  It refers to "Companies Incorporated and its group of

companies," and then goes on to say, "Companies Incorporated is committed to the

bedrock values of Honesty, Value, Service and Customer Satisfaction."  It also

states: "If you are interested or need helpful information about opening an offshore

bank account, speak to a representative about opening a bank account and trust.

Learn the many benefits and information about the bank account."  [Ex. 81.]

76.   Wessell claims that he sold Incway/CI to a business associate and CI

client, David Tan, because he was not using it anymore, and he was happy to get rid

of it because of the litigation.  [RT2, 21:3-6, 21:25, 22:5-9, 23:1-12, 28:5-29-3.]

According to Wessell, Tan signed the purchase documents in 2010, but did not pay

for Incway until two or three years later.  Incway had stopped conducting business

sometime in 2010.  It had no assets and zero net worth.  [RT2, 21:7-14, 23:12-16.]

77.   Wessell's supposed sale of Incway/CI, and professed motives for

doing so, are suspect – to say the least.  Wessell changed Incway's name to

Worldwide Education Services (WES).  Wessell continued to have substantial

involvement with, and control of, WES.  Wessell appointed himself as the sole

member of the board of directors of WES, changed its domicile from Wyoming to

the British Virgin Islands, and filed for bankruptcy in the British Virgin Islands.

[RT2, 20:11-15; 23:22-24; 24:13-15; 30:22-24; Ex. 45.]  Wessell, purporting to act

"solo in his capacity as a voluntary liquidator for Worldwide Education Services,"

filed a Verified Petition for Recognition of Foreign Proceedings in the U.S.

Bankruptcy Court, Central District of California.  [RT2, 25:11-22, 26:6-8; Ex. 45 at

17of 61.]

### *Lawrence's Role in Incway/CI*

78.   Lawrence received paychecks first from Incway and later from 1-800-

12

COMPANY, and believed those entities to be her employers from 2006 to 2012. [RT2, 65:6-21.]

79.   Before Lawrence was employed by CI, she operated a daycare center for seven years.  [RT2, 81:12-81:19.]

80.   Lawrence got the job at CI by responding to a newspaper ad.  [RT2, 67:7-67:9.]

81.   Lawrence's job title was bank and trust administrator.  She had no specific training for offshore banks, and relied on her prior work experience as a mortgage underwriter in reviewing applications for offshore banks.  [RT2, 68:19-21, 69:17-25.]

82.   Lawrence's primary role was to set up offshore companies and communicate with clients and potential clients.  Lawrence knew little about Swiss banks and less about Swedish banks. The only Swedish bank she knew was The Alps.  [RT2, 71:16-23, 73:23-74:1.]

### ***Mitchell's Role in Incway/CI***

83.   Mitchell was in CI's sales department and discussed with clients options for placing their funds overseas.  [RT2, 70:18-70:24.]

84.   Mitchell worked for CI for approximately seven years, and Wessell was his supervisor.  By the time Mitchell left CI, it was "branded" 1-800-COMPANY.  The phone number was 1-800-COMPANY, and the phone was answered "1-800 COMPANY."   [RT2, 35:17-37:1.]

85.   Mitchell's job title with CI was "account representative" or "asset protection specialist."  [RT2, 37:2-4; 42:23-43:1.]

86.   Mitchell spent virtually the entire time while at CI on the phone with customers.   [RT2, 37:8-11.]

87.   CI had at least three or four websites for domestic traffic and foreign offshore traffic.  [RT2, 39:13-21.]

88.   Mitchell claims that he gained knowledge of asset protection by

13

1  studying websites: "ours and others."  [RT2, 43:7-8, 43:23-25.]

2      89.   Mitchell studied business management at Antelope Valley College.

3  Before that, he was at L.A. Trade Tech, where he studied signs, sign graphics, color

4  modification, and composition.  He never completed college, and never took any

5  classes on asset protection.  Prior to working for CI, Mitchell never worked for any

6  other asset protection entities.  [RT2, 44:2-25.]

7  **1-800-COMPANY**

8      90.   As with the other entities, Wessell claimed that he does not know who

9  owns 1-800-COMPANY, how the ownership is currently structured, or whether he

10  has ever known how it was structured.  [Wessell Depo., 71:3-8, 71:21-25.]

11      91.   Wessell claimed to be unable to identify the people involved with 1-

12  800-COMPANY.  [Wessell Depo., 73:22-25.]   According to Mitchell, CI was

13  "branded" 1-800-COMPANY.

14  **PRESIDENTIAL SERVICES INCORPORATED (PSI)**

15      92.   PSI conducted seminars and provided management services for

16  establishing and assisting other companies.  [Wessell Depo., 34:1-9.]

17      93.   PSI provided management services to 1-800-COMPANY.  [Wessell

18  Depo., 70:17-71:2, 91:12-18.]  There is evidence – such as in the documents

19  Mitchell provided to Alexander – identifying CI as a division of PSI.  [Exhibit 5

20  (The Offshore Limited Liability Company *Quick Start Guide*) at p. 41.]

21      94.   Given the interconnectedness of Wessell and the corporate

22  defendants,  and the fraudulent purposes for which these entities were designed, the

23  exact relationship between the entities involved is unclear.  CI, PSI, and 1-800-

24  COMPANY; however, all were operated out of 28015 Smyth Drive, Santa Clarita,

25  California.  [Wessell Depo., 51:10-52:2, 74:9-15.]

26      95.   As with Incway/CI, Wessell managed and was a director, president,

27  secretary and treasurer of Presidential Services Incorporated (PSI).  He claimed not

28  to know if he was still an officer.  [Wessell Depo., 15:6-13, 45:5-11, 35:24-36:1.]

14

1    96.   Also as with Incway/CI, Wessell feigned ignorance about his position

2    as a PSI officer, including whether he was still an officer, and about the identity of

3    PSI shareholders.  [Wessell Depo., 34:17-23.]

4    97.   Although Wessell claimed that someone else had been the president,

5    secretary, treasurer or director of PSI, he could not identify a single person who

6    occupied those positions.  [Wessell Depo., 44:2-10.]

7    98.   Wessell's claims, such as not remembering if there were any other

8    directors of PSI, are not credible.  [Wessell Depo., 36:5-7.]

9    99.   PSI was the agent for service of process for Incway and Wessell was

10   the agent for service of process for PSI.  [Wessell Depo., 48:4-11; 49:12-17.]

11   100.   Wessell believes that he kept the corporate minutes of PSI, but

12   claims not to know whether they are still in existence.  [Wessell Depo., 36:23-37:5.]

13   101.   As with Incway/CI, Wessell claims not to know who has custody of

14   PSI's corporate minutes, where they are currently kept, or who might know their

15   whereabouts.  [Wessell Depo., 37:6-11.]

16   **THE ALPS**

17   102.   Wessell, Mitchell, and Filip Strebl were the founding members of

18   The Alps.  [RT2, 18:15-20; Ex. 33 (33 of 36).]  The first board meeting took place

19   in Santa Clarita, California.  [RT2, 17:22-24.]

20   103.   Wessell was The Alps' managing director, and was effectively

21   running it.  [RT2, 7:22-8:1; 17:9-15, 18:4-11; Ex. 33 (32 of 36).]  Mitchell also

22   acted as a director of The Alps.  [RT2, 111:5-24.]

23   104.   Wessell testified that he could not specifically recall what else

24   Mitchell did as director other than attending board meetings.  [RT2, 113:4-11.]

25   105.   In The Alps' registration documents filed in Sweden, Wessell gave

26   his address as 13 Poland Street, No. 26, London, yet Wessell had never been to, and

27   is not familiar with, this address.  [RT2, 8:18-9:18; Ex. 33.]

28   106.   In May 2006, Incway/CI, controlled by Wessell, provided an

15

unsecured line of credit for "startup capital" and operating costs to The Alps. Wessell acted for both the lender and the borrower, and the loan has never been repaid. [RT2, 115:13-116:6; Ex. 135.]

107.   All of the above entities were involved in an investment scheme enterprise.  On June 1, 2007, for instance, a client of CI was to purchase a piece of property in Tacoma, Washington.  At the closing date, an additional sum of $150,000 was due from The Alps to fund the closing.  "[T]o satisfy [CI's] client," CI loaned to The Alps the $150,000 by paying that sum to the escrow in Washington - allegedly because The Alps' wire transfer would not arrive until after the deadline. Wessel authorized the transaction as president of Incway/CI.  [Ex. 136.]

108.   Wessell retained Marshall G. Hann to represent The Alps. [RT2,129:5-129:6.]  Hann now represents the individual and corporate defendants in this lawsuit.

109.   Lawrence did not have a management role with The Alps, but she spoke with clients, including Alexander, about The Alps, urged them to place their money there as a "safe investment," and assisted clients with account access (including by providing account PIN numbers).  Lawrence explained that she never spoke with anyone at The Alps other than Wessell, whom she knew as its Chairman. [RT2, 72:11-16.]

110.   Wessell told Lawrence he saw a void for a European bank that did not have a substantial deposit requirement.  [RT2, 74:10-75:4.]

111.   Lawrence helped about a dozen clients open accounts with The Alps. [RT2, 76:2-4.]

112.   At the time Alexander attempted to withdraw $320,000 from The Alps, it did not have enough money to pay all of its members.  Alexander's request was not honored because Topiwala also wanted a sizeable withdrawal at the same time and loans were defaulting "right and left."  Wessell provided no explanation for

why The Alps' website showed that amount had been withdrawn from Alexander's account.  [RT2, 127:19-128:11, 129:18-22.]

### THE ALPS WAS A SHAM

113.   The Alps' homepage on the internet displaying a high rise office building in the World Trade Center, Stockholm, Sweden deliberately and falsely represents to the average person that The Alps' business operations were physically located in that building – and that The Alps was a substantial financial institution. [See Topiwala Depo, 13:1-14; RT1, 14:9-25; Ex. 24.]

114.   The Alps' headquarters was not in the World Trade Center, and The Alps did not have a lease with the World Trade Center.  It had a contract with a company called City Office.  City Office answered the phones and forwarded the mail.  The Alps never had an office in the World Trade Center -- or anywhere in Sweden.  [RT2, 96:10-20, 107:17-108:9, 43:8-43:16; Topiwala Depo,, 14:1-16.]

115.   At most, The Alps appears only to have had a post office box at an address used by numerous entities and an answering service also used by numerous other entities.  [Topiwala Depo, 38:17-39:12, RT1, 68:24-69:10.]

116.   While Wessell, Mitchell, and Lawrence represented that The Alps was a Swedish Credit Union, there is no evidence that it ever did business in Sweden, much less that it made loans to anyone in Sweden.  [RT2,130:22-131:3.] Indeed, all the documents that Wessell produced involving The Alps relate to investments in Washington.  About 95% of The Alps' loans were in the state of Washington.  [RT2, 123:11-13; 123:19-124:2;126:8-15; 130:6-9; Exhibits 97, 98, 104, 108, RT2.]

117.   Mitchell testified that he agreed to become a "nominee director," that is, a director with no responsibilities because it looked good on his resume.  He attended board meetings, but says that he did not participate in decisions.  [RT2, 41:16-42:9, 46:7-13.]

118.   The directors' meetings for The Alps took place in Valencia, California and Mitchell participated in the marketing and advertising aspects.  [RT2, 45:20-46:3.]

119.   Alexander had a login PIN for his account at The Alps that was mailed to him.  It appeared that it was coming from The Alps, but Alexander was never able to get anything directly from The Alps.  When he needed a new PIN number to access his account, he would get it from Lawrence.  This occurred two or three times and Lawrence provided him with a new PIN within a day.  [RT1, 15:6-16; RT2, 89:1-10.]  Lawrence's testimony to the contrary is not credible.

120.   The Alps was the only bank Mitchell knew of in Sweden that CI was recommending to potential customers.  He did not recommend any Swedish banks to clients other than The Alps.  Mitchell does not have any expertise in banking law, including Swiss and Swedish laws.  [RT2, 56:11-20.]  At trial, Mitchell initially denied telling people that putting money in The Alps was safer than putting it in a U.S. bank.  However, after being impeached with his deposition testimony, Mitchell admitted to telling customers that the advantage of putting their money in The Alps was that it was safer than U.S. banks.  He based that on the failure rate of U.S. banks at the time.  [RT2, 40:24-41:11, 46:21-48:4.]

121.   Mitchell testified that he does not believe that he was ever told The Alps' address, how many employees it had, what its business structure was, what its financial worth was, how it made a profit, how it functioned, how many branches it had, or whether it was regulated under Swedish law.  Despite recommending it as a safe place to put money, Mitchell says he asked Wessell very little about The Alps.  He has never seen anything that purported to be an office of the Alps or discussed such an office with Wessell.  He has never been to Sweden.  [RT2, 51:11-52:12, 53:8-54:3.]

122.   Even if the Court were to believe Mitchell's testimony, this would

1    mean that he recommended The Alps as an investment option to clients knowing

2    almost nothing about it; except, perhaps that it did not actually exist in the manner

3    being represented to clients.  Even giving Mitchell the benefit of the doubt, his

4    statements would have, at the very least, been made recklessly and without regard

5    for their truth as Mitchell kept himself deliberately ignorant of The Alps' role in the

6    investment scheme.

7              123.   The Court, however, does not believe Mitchell's testimony.  Mitchell

8    attended board meetings as a director.  Either the board meetings were a sham or

9    Mitchell is not telling the truth.  Mitchell participated in the fraudulent investment

10   scheme by giving clients, such as Alexander, the impression that he knew what he

11   was talking about with the express purpose of convincing them to invest in The

12   Alps.  Mitchell also deliberately withheld material facts from Alexander, such as his

13   position as a board member of The Alps.

14             124.   During trial, Lawrence similarly attempted to minimize her role in

15   the fraudulent scheme.  As part of her job at CI, she sent clients bank applications

16   for The Alps.  [RT2, 83: 9-10.]  She first testified that she did not have a supervisor

17   at CI, but when asked if that meant she was "free to operate as [she] saw fit," she

18   explained that "the supervisor would really be the banks."  [RT2, 83: 20-23.]  She

19   then claimed not to know anyone at The Alps to contact regarding customer issues.

20   This is despite testifying that "the banks" were her "supervisors," and her earlier

21   testimony that she recognized Wessell as the "Chairman" of The Alps.  [RT2, 84:4-

22   12.]

23             125.   Lawrence's testimony is not credible.  It is a transparent attempt to

24   distance her from the fraudulent scheme.  On the one hand, she attempts to create

25   the impression that she was simply doing what she was told and, on the other, she

26   takes the position that no one was in charge.

27             126.   Wessell's deposition testimony was the most evasive the Court has

28

1   experienced in thirty-three years.  Wessell's explanation for his admittedly poor

2   performance at his deposition was that he had watched a videotape explaining how

3   to be deposed.  The Court finds his explanation to be absurd – and inconsistent with

4   his actual deposition performance.  Where Wessell refused to answer a direct

5   question about which he obviously had knowledge, the Court concludes that he did

6   so to avoid admitting the fact asserted.  The Court concludes the fact was true.

7   Wessell also consistently was evasive, or simply lied, at trial.  To the extent there is

8   any dispute between the testimony of Alexander, Topiwala, and Vacchiano, on the

9   one hand, and Wessell on the other hand, the Court believes the testimony of

10  Alexander, Topiwala, and Vacchiano and does not believe the testimony of Wessell.

11  In addition, the Court finds that much of Wessell's other testimony is simply untrue.

12  The Court bases this determination on its observations of Wessell's demeanor and

13  manner while testifying at his videotaped deposition - some of which was played in

14  open Court – as well as its observations of Wessell's in person trial testimony.

15       127.   Any finding of fact that constitutes a conclusion of law should be

16  treated as such.

17       128.   The Court finds the further factual findings requested by the parties

18  are either unsupported or unnecessary to the Court's determination.

19  **CONCLUSIONS OF LAW**

20  **A. INTENTIONAL MISREPRESENTATION**

21       129. "To establish a claim for deceit based on intentional

22  misrepresentation, the plaintiff must prove seven essential elements: (1) the

23  defendant represented to the plaintiff that an important fact was true; (2) that

24  representation was false; (3) the defendant knew that the representation was false

25  when the defendant made it, or the defendant made the representation recklessly and

26  without regard for its truth; (4) the defendant intended that the plaintiff rely on the

27  representation; (5) the plaintiff reasonably relied on the representation; (6) the

28  plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's

1  representation was a substantial factor in causing that harm to the plaintiff."

2  Manderville v. PCG & S Group, Inc., 146 Cal. App. 4th 1486, 1498 (2007)

3  (emphasis omitted); see Judicial Council of California, *Civil Jury Instructions* CACI

4  1900; *California Civil Code* §§ 1572, 1709, 1710; Engalla v. Permanente Medical

5  Group, Inc., 15 Cal. 4th 951, 974 (1997); City of Atascadero v. Merrill Lynch,

6  Pierce, Fenner & Smith, 68 Cal. App. 4th 445, 482 (1998).

7       130.   Wessell, Mitchell, and Lawrence represented to Alexander that

8  certain important facts were true, but those representations were false.  Wessell told

9  Alexander that Sweden had a better banking system than Switzerland and "highly

10  recommended" that he deposit his money with The Alps.  Wessell represented that

11  The Alps was a well-established bank in Sweden that had been around for a long

12  time when, in fact, it was an unregulated credit union operating out of the same

13  offices in Valencia, California as Defendants.  Wessell, Mitchell, and Lawrence led

14  Alexander to believe that The Alps was a safe place to put his money.  Alexander's

15  money was not safe in The Alps.  The Alps was undercapitalized, was controlled by

16  Wessell, was not regulated by Swedish authorities, and was being used to buy, sell,

17  and lend money on real estate ventures in the state of Washington.

18       131.   Wessell knew that these representations were false when he made

19  them.  Mitchell and Lawrence had sufficient information from which they should

20  have known that the statements were false when made.  At the very least, Mitchell

21  and Lawrence made the statements recklessly and without regard for their truth.

22       132.   Wessell, Mitchell, and Lawrence intended that Alexander rely on

23  their misrepresentations so that he would deposit funds in The Alps.  They made the

24  misrepresentations for the specific purpose of convincing Alexander to deposit

25  funds in The Alps, which would benefit Wessell, Mitchell, and the corporate

26  entities.  Wessell, Mitchell, and Lawrence induced Alexander's reliance on their

27  statements by holding themselves out as experienced asset protection specialists

28  when, in fact, they were not.

21

133.   Alexander reasonably relied on the misrepresentations in deciding to place funds with The Alps.

134.   Defendants contend their statements were mere "puffery."  "[A] statement is considered puffery if the claim is extremely unlikely to induce consumer reliance. Ultimately the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim."  Newcal Industries, Inc. v. IKON Office Solutions, 513 F.3d 1038, 1053 (9th Cir. 2008).

135.   Even if the statements that The Alps was a safe place to keep money and that Sweden had the best banking regulations in the world could be viewed as statements of opinion as opposed to fact, the Court finds them to be actionable under the circumstances.  Defendants claimed to be experts in the field of asset protection, which included recommending where clients should place their funds.  They represented themselves as having superior knowledge of the facts, and to have made the same recommendations and to have performed the same functions for many clients.  They stated that these clients were happy with the results.  See Jolley v. Chase Home Finance, LLC., 213 Cal. App. 4th 872, 892 (2013) ("[I]t is well settled that an opinion may be actionable when it is made by a party who possesses superior knowledge.") (citation and quotations omitted); Mosier v. Southern California Physicians Ins. Exchange, 63 Cal. App. 4th 1022, 1045 (1998) ("[W]hen one party possesses or holds himself out as possessing superior knowledge or special information regarding the subject of a representation, and the other party is so situated that he may reasonably rely upon such supposed superior knowledge or special information, a representation made by the party possessing or holding himself out as possessing such knowledge or information will be treated as a representation of fact although if made by any other person it might be regarded as an expression of opinion.").  It is "[e]qually well recognized that there may [also] be liability for an opinion where it is expressed in a manner implying a factual basis

22

1  which does not exist." Jolley, 213 Cal. App. 4th at 893 (citations and quotations

2  omitted).  Defendants' misrepresentations did just that.

3       136.   Alexander did not have reason to believe that Defendants were not

4  telling the truth.  Moreover, Alexander was not required to conduct a due diligence

5  investigation.  There is no evidence that before he deposited his funds with The Alps

6  Alexander became aware of facts that would make a reasonably prudent person

7  suspicious, thereby triggering a duty to further investigate.  See Deveny v. Entropin,

8  Inc., 139 Cal. App. 4th 408 (2006) (when considering when the statute of limitations

9  in a securities action began to run, "posting information on the company's website

10  concerning ambiguous scientific data and referring investors to that website for

11  general information was not, as a matter of law, sufficient to put investors on inquiry

12  notice in the absence of a showing that the investors actually saw that

13  information.").

14       137.   Even if a duty to inquire had arisen, the result would be the same.

15  Where a person becomes "aware of facts which would make a reasonably prudent

16  person suspicious, she ha[s] a duty to investigate further, and she [is] charged with

17  knowledge of matters which would have been revealed by such an investigation."

18  Miller v. Bechtel Corp., 33 Cal. 3d 177, 181 (1983).

19       138.   Alexander was put on notice when his brother told him about the

20  further information on the website, and potentially when he had difficulty obtaining

21  the $50,000 he requested from The Alps.  But by that time, it was too late.  In any

22  event, although Alexander could have found out that Sweden did not regulate credit

23  unions, that The Alps invested in real estate, and that there might be a delay in

24  obtaining withdrawals, it would have been difficult, if not impossible, for Alexander

25  to discover the truth about The Alps and its relationship with Wessell, Mitchell, and

26  the corporate entities.  Wessell designed the scheme for the very purpose of

27  concealing the actual location and true activities of The Alps.  Topiwala testified

28  that when he inquired about the management structure of The Alps, Mitchell and

1 Wessell told him that such information was not publically available.  The evidence
2 shows that further questioning would have likely led to more misrepresentations.

3    139.   Alexander was harmed by the loss of the funds he deposited with
4 The Alps.

5    140.   Alexander's reliance on Wessell's, Mitchell's, and Lawrence's
6 representations was a substantial factor in causing his harm.  Alexander would not
7 have transferred his money to The Alps had he known what The Alps intended to do
8 with his money, and that it was not safe.

9    141.   Alexander suffered damages in the amount of $524,785 as a direct
10 and proximate cause of the misrepresentations.

11    142.  Alexander is entitled to punitive damages, as discussed below.

12    **B.  CONCEALMENT AND SUPPRESSION OF FACTS**

13    143.   "Actual fraud consists, among other things, of '[t]he suppression of
14 that which is true, by one having knowledge or belief of the fact' or '[a]ny other act
15 fitted to deceive.'"  Boschma v. Home Loan Center, Inc., 198 Cal. App. 4th 230,
16 248 (2011) (quoting Cal. Civ. Code, §1572, subds.(3), (5)); see also Cal. Civ. Code
17 §1710, subd. (3) (definition of "deceit" includes "[t]he suppression of a fact, by one
18 who is bound to disclose it, or who gives information of other facts which are likely
19 to mislead for want of communication of that fact"); Vega v. Jones, Day, Reavis &
20 Pogue, 121 Cal. App. 4th 282, 292 (2004).

21    144.   "[T]he elements of an action for fraud and deceit based on
22 concealment are: (1) the defendant must have concealed or suppressed a material
23 fact, (2) the defendant must have been under a duty to disclose the fact to the
24 plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact
25 with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of
26 the fact and would not have acted as he did if he had known of the concealed or
27 suppressed fact, and (5) as a result of the concealment or suppression of the fact, the
28 plaintiff must have sustained damage."  Boschma, 198 Cal. App. 4th at 248

1  (citations and quotations omitted); see Judicial Council of California, *Civil Jury*
2  *Instructions* CACI 1901.

3       145.   Wessell, Mitchell, and Lawrence intentionally failed to disclose
4  material facts to Alexander that they had a duty to disclose.  "A duty to speak may
5  arise in four ways: it may be directly imposed by statute or other prescriptive law; it
6  may be voluntarily assumed by contractual undertaking; it may arise as an incident
7  of a relationship between the defendant and the plaintiff; and it may arise as a result
8  of other conduct by the defendant that makes it wrongful for him to remain silent."
9  SCC Acquisitions Inc. v. Central Pacific Bank, 207 Cal. App. 4th 859, 864 (2012)
10  (citation and quotations omitted).

11       146.   Defendants represented themselves to be experts in the field of asset
12  protection.  Alexander was a client of Defendants such that the parties had a
13  confidential relationship.  A duty to disclose also arose as a result of Defendants'
14  conduct.  Defendants led Alexander to believe that he was depositing his funds with
15  a safe financial institution in Sweden when, in fact, his money was being used to
16  speculate on real estate in Washington.

17       147.   Defendants intended to deceive Alexander by concealing the facts
18  from him so that he would place his money with The Alps.

19       148.   Alexander did not know of the concealed facts and reasonably relied
20  on Defendants' deception in investing money with The Alps.

21       149.   Alexander would not have acted as he did had he known of the
22  concealed facts.  Alexander testified that had he known that Swedish credit unions
23  were unregulated and that his money deposited with The Alps would be put into real
24  estate investments in Washington, he would not have invested with The Alps.
25  Defendants Wessell and Mitchell did not inform Alexander that they were directors
26  of The Alps.  Lawrence did not reveal her knowledge that The Alps was a relatively
27  recent creation of Wessell and that she had never had contact with anyone at The
28  Alps other than Wessell.  Defendants had a duty to disclose such facts as they were

material to Alexander's decision to deposit funds with The Alps – as they would have been to any reasonable person seeking to deposit funds in a safe financial institution.  Defendants also failed to disclose that The Alps actually had no employees or offices, but instead, was operating out of Valencia, California. Defendants' intentional failure to disclose material facts was a substantial factor in causing Alexander harm.

150.   Alexander suffered damages in the amount of $524,785 as a direct and proximate cause of Defendants' intentional concealment of material facts. Alexander is entitled to punitive damages, as discussed below.

## C. <u>NEGLIGENT MISREPRESENTATION</u>

151.   "Negligent misrepresentation is a separate and distinct tort, a species of the tort of deceit.  Where the defendant makes false statements, honestly believing that they are true, but without reasonable ground for such belief, he may be liable for negligent misrepresentation, a form of deceit."  <u>Bily v. Arthur Young & Co.</u>, 3 Cal. 4th 370, 407 (1992) (citation and quotations omitted); <u>see</u> Judicial Council of California, *Civil Jury Instructions* CACI 1903; Cal. Civ. Code §1710 (2).

152.  Mitchell and Lawrence represented to Alexander that important facts were true when they, at the very least, had reasonable grounds to believe that they were not true.  As discussed above, most, if not all, of the statements Mitchell and Lawrence made to Alexander were statements that they knew to be false, or were made without regard for their truth.  To the extent Mitchell and Lawrence honestly believed that some of their false statements were true, they are liable for negligent misrepresentation.

153.   Mitchell held himself out as an "asset protection specialist," but he had no such specialized knowledge.  Mitchell made numerous representations to Alexander regarding The Alps and the safety of Swedish banks compared to Swiss banks.  Mitchell's trial testimony, however, showed that he had no real basis for these statements.  At the very least, even if the Court were to find Mitchell's

testimony credible, he made statements to persuade Alexander to invest in The Alps even though he knew very little about it.

154.   Lawrence made the same representations as Mitchell regarding The Alps and the Swedish banking system, although she also claims to have had very little knowledge about either.

155.   Mitchell's and Lawrence's representations were not true.

156.   Mitchell and Lawrence did not have reasonable grounds for believing these representations to be true when they made them.

157.   Mitchell and Lawrence intended that Alexander rely on their representations.

158.   Alexander was entitled to rely on Mitchell's and Lawrence's representations as they held themselves out as an "asset protection specialist" and the "bank and trust administrator," respectively.

159.   Mitchell and Lawrence made the representations to Alexander for the purpose of convincing him to deposit money with The Alps.  Alexander's reliance on their representations was reasonable.

160.   Alexander was harmed and his reliance on Mitchell's and Lawrence's representations was a substantial factor in causing his harm.

161.   Alexander did not assume the risk in depositing his funds with The Alps and is not comparatively liable for his damages.

162.   Alexander suffered damages in the amount of $524,785 as a direct and proximate cause of their negligent misrepresentations.

**D. PUNITIVE DAMAGES AGAINST WESSELL AND CORPORATE DEFENDANTS**

163.   "Punitive damages may be imposed under state law to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition." Nickerson v. Stonebridge Life Ins. Co., 219 Cal. App. 4th 188, 203 (2013) (citations and quotations omitted).  "Civil Code section 3294 provides that punitive damages

may be awarded in an action for breach of an obligation not arising from contract, if the plaintiff proves by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Scott v. Phoenix Schools, Inc., 175 Cal. App. 4th 702, 715 (2009). "The clear and convincing standard requires a finding of high probability . . . so clear as to leave no substantial doubt." Id. (citations and quotations omitted). Malice is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code, §3294(c)(1). Oppression is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civ. Code, §3294(c)(2). "'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code §3294(c)(3). "Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate." Scott, 175 Cal. App. 4th at 716 (citation and quotations omitted).

164. "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Nickerson, 219 Cal. App. 4th at 204 (citations and quotations omitted). The Court considers the reprehensibility of Defendants' behavior by considering: the type of harm caused (*e.g.*, physical versus economic); whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; whether the target of the conduct had financial vulnerability; whether the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. Id.

165. The Court finds that these factors and the burden of proof do not support an award of punitive damages against Mitchell or Lawrence.

28

166.   However, Alexander has shown by clear and convincing evidence that Wessell, and through him, the corporate entities, engaged in this conduct repeatedly, that the conduct was the result of deliberate deceit and trickery, and that punitive damages in the amount of $2,000,000 is appropriate.

## E. **RICO VIOLATION**

167.   The Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §1962(c), makes it unlawful for any person "employed by or associated with" a qualifying enterprise "to conduct or participate in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  To establish his RICO claim Alexander must prove: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity; (5) causing injury to his "business or property." Sedima v. Imrex Co., Inc., 473 U.S. 479, 496 (1985); Living Designs, Inc. v. E. I. Dupont de Numours and Co., 431 F.3d 353, 361 (9th Cir. 2005) (stating elements of a civil RICO claim); *Ninth Circuit Model Civil Jury Instructions*, Civil RICO, Instruction 19.

168.   "The definition of 'enterprise' in the text of RICO is fairly straightforward . . . 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Odom v. Microsoft Corp., 486 F.3d 547, 548 (9th Cir. 2007) (citing 18 U.S.C. §1961(4)).  An enterprise may also be an association of persons or entities.  "[A]n associated-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct." Id. at 552 (citation and quotation omitted).  "To establish the existence of such an enterprise, a plaintiff must provide both evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." Id.

169. The "enterprise" consisted of a closely inter-related group of corporate

1  entities, including Incway, CI, PSI, 1-800-COMPANY, The Alps, and perhaps

2  others.

3        170.   The enterprise affected interstate and foreign commerce because it

4  conducted business over the internet, and, among other things, assisted in arranging

5  for funds to be wire-transferred from Alexander's bank account in Hawaii, which

6  funds eventually were transferred to The Alps.  It also assisted in the transfer of

7  other funds from financial institutions in the United States to financial institutions in

8  other countries.

9        171.   An act of "racketeering activity" is also called a predicate act.  Mail and

10  wire fraud are predicate acts for a RICO claim.  See Sanford v. MemberWorks, Inc.,

11  625 F.3d 550, 557 (9th Cir. 2010).  "Wire or mail fraud consists of the following

12  elements: (1) formation of a scheme or artifice to defraud; (2) use of the United

13  States mails or wires, or causing such a use, in furtherance of the scheme; and (3)

14  specific intent to deceive or defraud."  Id. at 557.  Wessell, Mitchell, and Lawrence

15  used the United States mails, telefaxes, wires and internet services to further their

16  fraudulent scheme and their actions constitute mail and wire fraud.  [RT1, 6:3-7:17,

17  8:10-23, 9:9-11:8, 11:17-22, 41:20-42:19, 63:9-16,  66:17-14, 66:24-67:14.]

18        172.   A pattern of racketeering activity requires a showing of two or more

19  related acts of racketeering activity.  Wessell, Mitchell, and Lawrence engaged in a

20  "pattern of racketeering activity" by committing numerous acts of mail and wire

21  fraud within a 10 year period to further their fraudulent investment scheme.

22  Wessell, Mitchell, and Lawrence employed a common scheme - defrauding not only

23  Alexander, but also Vacchiano and Topiwala, and likely others.  The individual

24  Defendants' association with the enterprise facilitated their commission of the

25  racketeering acts.

26        173.   Wessell, Mitchell, and Lawrence willfully and knowingly were part of

27  a scheme to defraud and obtained money by means of false pretenses,

28  misrepresentations, and representations that were made recklessly.  Wessell solicited

potential clients by conducting free online seminars on how to set up an asset protection plan with the specific intent of defrauding investors.  [See, e.g., Exs. 40-42 (You-Tube presentations by Kevin Wessell) and Ex. 81 (Website of Offshore Corporation).]  Wessell, Mitchell, and Lawrence concealed material facts, specifically that Wessell and Mitchell were directors of The Alps, that CI had made loans to The Alps, that The Alps was regularly engaged in the business of investing in real estate in the United States, that The Alps was not a credit union as that type of institution is known in the United States, and it did not have an actual physical presence in Sweden but operated out of Valencia California.

174.   Wessell, Mitchell, and Lawrence enriched themselves by charging clients a fee for setting up offshore companies and bank accounts and by persuading clients to deposit their funds with The Alps.

175.   The Court finds that Alexander has proved by a preponderance of the evidence that Wessell, Mitchell, and Lawrence knowingly and willfully engaged in a pattern of racketeering activity through a RICO enterprise.

176.   Once a pattern of racketeering orchestrated through a RICO enterprise has been established, an actionable claim under civil RICO against a particular defendant still requires proof (1) that the particular defendant was distinct from the alleged RICO enterprise, (2) that the defendant was "employed by or associated with [the] enterprise" and (3) that the defendant "conduct[ed] or participat[ed], directly or indirectly, in the conduct of such enterprises affairs through [the] pattern of racketeering activity[.]" 18 U.S.C. §1962(c).

177.   First, Wessell, Mitchell, and Lawrence are each distinct from the RICO enterprise.

178.   As to the second requirement, a defendant is considered to have "associated with" a RICO enterprise if he engages in the predicate act violations with other members of the enterprise, even if he is not an actual "insider" of the enterprise. Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,

31

113 F.Supp.2d 345, 366 - 67 (E.D.N.Y. 2000).  Wessell, Mitchell, and Lawrence were all employed by, or otherwise associated with, the enterprise.

179.   The third requirement, that the defendant has "conduct[ed] or participat[ed]" in the affairs of the enterprise, contemplates that the defendant be involved in the operation, direction or management of the enterprise.  Reves v. Ernst & Young, 507 U.S. 170, 183 (1993).  RICO liability is not limited to those with primary responsibility for the enterprise's affairs, . . . but some part in directing the enterprise's affairs is required.").  In adopting the "operation or management" test, the Supreme Court recognized that "[a]n enterprise is "operated" not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."  Reves, 507 U.S. at 184; see Blue Cross and Blue Shield of New Jersey, Inc., 113 F.Supp.2d at 366 -367 ("A showing of active participation in at least partial orchestration or direction of the racketeering activities of the enterprise is generally sufficient to satisfy the "conduct or participate" requirement of section 1962(c).").

180.  All three individual Defendants knowingly and willfully participated in the enterprise's affairs to varying degrees.  Wessell was the mastermind behind the scheme.  Mitchell acted as the "asset protection specialist" and served on The Alps board of directors.  Lawrence, although a "lower rung" participant in the enterprise under Wessell's direction, also played a key role by interfacing with clients about The Alps and assisting with the operation of its affairs by, among other things, arranging for the transfer of funds to The Alps.

181.  Alexander lost funds as a result of Defendants' fraudulent investment scheme.  Alexander's financial loss was a direct result of the fraudulent investment scheme and Wessell, Mitchell, and Lawrence's RICO violations.  Alexander suffered damages in the amount of $524,785.

182.   A plaintiff who prevails on a RICO claim is also entitled to recover

treble damages, plus attorneys' fees and costs.  18 U.S.C. §1964(c).  Under RICO's mandatory treble damages provisions, Alexander is entitled to a damages award of $1,574.355.00 ($524,785 x 3).  Alexander is also entitled to recover attorney's fees and costs.  Alexander shall make an appropriate application for attorney's fees and costs following entry of judgment in accordance with L.R. 54-10 and the Court's Standing Order, and Attorney's Fees Order.

## F.  **ALTER EGO LIABILITY**

183.   "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests.  In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation."  Mesler v. Bragg Management Co., 39 Cal.3d 290, 300 (1985).  There are two requirements for alter ego liability: (1) there is a unity of interest and ownership such that the separateness between the individual and corporation no longer exists; and (2) failure to treat the individual and corporation as one and the same will lead to an inequitable result.  Id.; see also Doney v. TRW, Inc., 33 Cal.App.4th 245, 249 (1995) ("The alter ego doctrine will only be applied to avoid an inequitable result").

184.   In Associated Vendors, Inc. v. Oakland Meat Co., 210 Cal.App.2d 825 (1962), the California district court of appeals summarized the well-known factors relevant to this determination:

> Commingling of funds and other assets, failure to segregate funds . . . and the unauthorized diversion of corporate funds or assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; . . . the failure to maintain minutes or adequate corporate records ...; ... sole ownership of all of the stock in a corporation by one individual or the members of a family;  . . . the failure to adequately capitalize a corporation; the total absence of corporate assets and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the . . . concealment of

personal business activities;  . . . the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors . . . ; [and] contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability . . . .

Id. at 838–40 (internal citations omitted).

185.  There was a unity of interest between and among Wessell, Incway, CI, PSI, 1-800-COMPANIES, and The Alps such that the separate personalities of the entities and Wessell no longer existed.  The evidence shows that these entities were alter egos of Wessell.  There is evidence of commingling of funds and other assets, treatment by Wessell of the entities' assets as if they were his own, failure to maintain adequate corporate records, identical equitable ownership of two or more entities, inadequate capitalization, concealment of the identity of the responsible ownership, diversion of assets, and manipulation of assets and liabilities between entities.

186.  Failure to treat Wessell as one and the same as these entities will lead to an inequitable result.  Wessell has placed Incway and PSI into bankruptcy in a transparent effort to avoid liability.

187.   There is insufficient evidence to support a claim that either Mitchell or Lawrence is an alter ego of any of these entities.

**G. INTEREST**

**1.  Pre-judgment Interest**

188.  "Whether prejudgment interest is permitted in a particular case is a matter of statutory interpretation, federal common law, and, in some instances, state law."  Schneider v. Cnty. of San Diego, 285 F.3d 784, 789 (9th Cir. 2002) (citing Monessen Sw. Ry. Co. v. Morgan, 486 U.S. 330, 337–38 (1988)).

189.   As to Alexander's state law claims, the Court has discretion to award pre-judgment interest.  See Cal. Civ. Code §3288.   An award of pre-judgment interest on Alexander's RICO claim is also within the Court's sound discretion.  See Home Sav. Bank, F.S.B. by Resolution Trust Corp. v. Gillam, 952 F.2d 1152, 1165

(9th Cir. 1991) ("The award of pre-judgment interest in a case arising under federal law rests within the sound discretion of the court.") (citation omitted);  see also Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1571 (1st Cir. 1994) (decision as to whether to award prejudgment interest under RICO is left to district court's discretion); Abou–Khadra v. Mahshie, 4 F.3d 1071, 1084 (2d Cir.1993) (RICO statute does not contain provision barring prejudgment interest, and any such award is discretionary).

190.  An award of pre-judgment is appropriate for both Alexander's federal and state law claims.  Alexander's damages in the amount of $524,785 are certain and known by Defendants.  Alexander transferred this amount to The Alps.  Alexander is entitled to pre-judgment interest from January 16, 2009 – the date when Alexander last wired funds to be deposited with The Alps – until the date of the Court's judgment.  See, e.g., In re Ekrem, 192 B.R. 982 (C.D. Cal. 1996) (awarding interest under Cal. Civ. Code §3288 in fraud case from the date defrauded party parted with his money on basis of defendant's fraud).

191.  For the pre-judgment interest award on Alexander's California law based claims, the appropriate interest rate is 7%.  Cal. Const., art. 15, § 1; Continental Airlines, Inc. v. McDonnell Douglas Corp., 216 Cal.App.3d 388, 434 (1989) (setting 7% as the correct prejudgment interest rate in a case for fraud and breach of contract because "there is no relevant legislative act specifying a rate of prejudgment interest for a fraud claim").

192.   As to Alexander's RICO claim, Section 1961 provides the proper rate "unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate."  United States v. Gordon, 393 F.3d 1044, 1058 n.12 (9th Cir. 2004) (citations omitted).  The rate in Section 1961(a) is appropriate in this case.

193.   Alexander does not argue that he is entitled to pre-judgment interest on

35

the entire treble damages amount for his RICO claim.  Generally, pre-judgment interest is appropriate on a compensatory damages award.  See MHC, Inc. v. Or. Dep't of Revenue, 66 F.3d 1082, 1090 (9th Cir. 1995) (citation omitted) ("[A]n award of prejudgment interest is intended to be purely compensatory.").  The Ninth Circuit has not expressly addressed whether RICO treble damages are compensatory or punitive.  It has, however, described the trebling of damages available under other federal statutes as "statutory punitive measures[s]".  Kline v. Coldwell, Banker & Co., 508 F.2d 226, 235 (9th Cir. 1974).  The Seventh Circuit has described RICO treble damages as "primarily compensatory in nature," reasoning that treble damages "ensure that wrongs will be redressed in light of recognized difficulties of itemizing damages."  Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1310 n. 8 (7th Cir. 1987).  The Court is persuaded that treble damages are punitive in nature. Moreover, the Liquid Air Corp. court's rationale does not apply here.  Alexander's damages – based on his deposits with The Alps -- were capable of precise calculation.  An award of pre-judgment interest is thus appropriate only as to $524,785 of the damages awarded.

### 2.  Post-judgment interest

194.  "Section [28 U.S.C.] 1961 provides for the mandatory award of post-judgment interest on any money judgment in a civil case recovered in a district court."  Planned Parenthood of Columbia/Willamette Inc. v. Am. Coalition of Life Activities, 518 F.3d 1013, 1017 (9th Cir. 2008) (citations and quotations omitted). Post-judgment interest runs from the date of a judgment when the damages were supported by the evidence and meaningfully ascertained.  Alexander is entitled to post-judgment interest on the damages awarded from the date of judgment at the current statutory rate pursuant to 28 U.S.C. §1961(a).

### H. JOINT AND SEVERAL LIABILITY

195.  Defendants are jointly and severally liable for economic damages in the

amount of $524,785, plus interest.  See <u>Aetna Health Plans of California, Inc. v. Yucaipa-Calimesa Joint Unified School Dist.</u>, 72 Cal. App. 4th 1175, 1190 (1999) ("injured plaintiff [may] recover the full amount of economic damages suffered, regardless of which tortfeasor or tortfeasors are named as defendants.  The tortfeasors are left to sort out payment in proportion to fault amongst themselves, and they must bear the risk of nonrecovery from impecunious tortfeasors.").

196.  Wessell, Mitchell, and Lawrence are liable under RICO for treble damages in the amount of $1,574.355.00, (plus interest on $524,785, as discussed above), plus attorneys' fees and costs.  As an alternative to RICO treble damages, Alexander is entitled to punitive damages against Wessell and the corporate Defendants in the amount of $2,000,000 as discussed above.

197.  Any conclusion of law that is actually a finding of fact should be treated as such.

I. **FINAL JUDGMENT**

198.  Alexander's counsel must submit a proposed form of judgment within fourteen days of the entry of this Order.  Any objections must be filed within fourteen days of the submission of the proposed form of judgment.  The amount of prejudgment interest shall be calculated consistent with this opinion.

DATED:     10/11/13        _____
                          Dale S. Fischer
                          United States District Judge

37